1  ROBBINS GELLER RUDMAN & DOWD LLP
   SHAWN A. WILLIAMS (213113)
2  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
3  Telephone:  415/288-4545
   415/288-4534 (fax)
4  shawnw@rgrdlaw.com
        – and –
5  DARREN J. ROBBINS (168593)
   TRAVIS E. DOWNS III (148274)
6  BENNY C. GOODMAN III (211302)
   655 West Broadway, Suite 1900
7  San Diego, CA  92101
   Telephone:  619/231-1058
8  619/231-7423 (fax)
   darrenr@rgrdlaw.com
9  travisd@rgrdlaw.com
   bgoodman@rgrdlaw.com
10
   Attorneys for Plaintiff
11
   [Additional counsel appear on signature page.]
12
                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14
                          SAN JOSE DIVISION
15

| | |
|---|---|
| CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of CISCO SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> WESLEY G. BUSH, MARK GARRETT, MICHAEL D. CAPELLAS, JOHN L. HENNESSY, KRISTINA M. JOHNSON, RODERICK C. McGEARY, ARUN SARIN, BRENTON L. SAUNDERS, M. MICHELE BURNS, LISA SU, STEVEN M. WEST and CHARLES H. ROBBINS, <br><br> Defendants, <br><br> – and – <br><br> CISCO SYSTEMS, INC., a California corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT AND VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

**OVERVIEW**

1.     This is shareholder derivative action on behalf of nominal party Cisco Systems, Inc. ("Cisco" or the "Company") against its Board of Directors ("Board") and Chief Executive Officer ("CEO") for breach of fiduciary duty, unjust enrichment and violation of the federal securities laws.[1] This action follows Plaintiff's 35-page pre-suit demand on the Cisco Board, a true and correct copy of which is attached as Exhibit A.

2.     Since at least 2015, Defendants publicly misrepresented Cisco's success as an industry leader in top leadership diversity and as a Company that effectively promotes diversity throughout its ranks.  In reality, there is a visible absence of African Americans in leadership positions across Cisco, including no African Americans on Cisco's Board.  Cisco's senior Executive Leadership Team is likewise devoid of any African Americans, and the noticeable lack of African Americans at Cisco extends deep into the Company, that is to the vice president, leadership and people manager levels as well.  Although each of the Defendants was aware of this reality between 2015 and 2020, and that this situation has persisted for years, Defendants repeatedly represented that "Cisco regularly evaluates the need for board refreshment" and that, "[a]s a part of its consideration of director succession," the Board "believes it is important to consider diversity of race . . . in evaluating board candidates."  Cisco Systems, Inc., Proxy Statement (Sch. 14A) (Oct. 22, 2019) ("2019 Proxy Statement") at 4-5.

3.     The business case for diversity is stronger than ever.  In 2015, McKinsey & Company ("McKinsey") first reported a statistically significant relationship between a more diverse leadership team and better financial performance, finding that "[c]ompanies in the top quartile of racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median," while "[c]ompanies in the bottom quartile for both gender and ethnicity/race were statistically less likely to achieve above-average financial returns than the average companies in the dataset (that is, they were not just not leading, they were lagging)."  Vivian Hunt, Dennis Layton & Sara Prince,

---

[1]     Defendants are Wesley G. Bush, Mark Garrett, Michael D. Capellas, John L. Hennessy, Kristina M. Johnson, Roderick C. McGeary, Arun Sarin, Brenton L. Saunders, M. Michele Burns, Lisa Su, Steven M. West, and Charles H. Robbins (together, "Defendants").

1   *Diversity Matters*, McKinsey & Company, at 1 (Feb. 2, 2015) ("*Diversity Matters*"),

2   https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/

3   why%20diversity%20matters/diversity%20matters.pdf.

4        4.      Cisco has been damaged and irreparably harmed by Defendants' conscious,

5   continuing failure to actually do what they have repeatedly told shareholders they would do –

6   embrace racial diversity throughout Cisco's corporate enterprise.  By this action, Plaintiff seeks to

7   remedy Defendants' dereliction of their legal duty to act in the best interests of Cisco and remove the

8   institutional structures preventing the Company from fulfilling its stated diversity objectives.

9                                      **INTRODUCTION**

10        5.      At almost every opportunity, Cisco publicly asserts its commitment to "inclusion and

11   diversity" at every level of the Company.  The Company acknowledges diversity is "essential" to

12   better teams, more innovation and "ultimately" more success.  For example, Defendants caused

13   Cisco to represent:

14   • "***Within our own company, we continue to transform our culture – driving
15   diversity and inclusion throughout our entire organization and implementing
     sustainable business practices to reduce our environmental impact***."  Cisco
16   Systems, Inc., 2019 Corporate Social Responsibility Report ("2019 CSR Report") at
     3.[2]

17   • "At Cisco, ***we are committed to full-spectrum diversity inclusive*** of gender,
18   ethnicity, ***race***, orientation, age, ability, veteran status, religion, culture, background,
     experience, strengths, and perspectives."  *Id.* at 38.
19

20   • "***Diversity***, inclusion, collaboration, and technology are ***fundamental to who we are***,
     how we create the best teams, ***and how we will succeed*** in this age of digital
21   transformation."  *Id.*

22   • "***Our work is focused on achieving four key business outcomes:  Diverse
     leadership and workforce***, inclusive and collaborative culture, community
23   engagement and impact, and inclusion and collaboration industry leadership."  *Id.*

24   • "We are also focused on building a thriving workforce that ***embraces diversity across
25   the spectrum at every level*** by using technology to better recruit, hire, and develop
     diverse talent."  Cisco Systems, Inc., 2018 Corporate Social Responsibility Report
26   ("2018 CSR Report") at 5.

27

28   _____
     [2]   Emphasis has been added unless otherwise noted.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                              - 2 -

- • "Amid this age of digital transformation, we believe inclusion, **diversity**, and collaboration make us more innovative, more agile, **and ultimately more successful. This commitment starts at the top**." *Id.* at 10.

6. Corporate platitudes and virtue signaling do not equate to fulfilling Cisco's public commitment to diversity. In reality, Cisco has lacked and continues to lack diversity at the top, and elsewhere, and is one of the few remaining publicly traded companies in the United States that lacks even a single African American director. The following are the ten members of the 2019 Board:



7. As the charts below demonstrate, Cisco has failed to increase African American representation on the Board since at least 2015.





8.   Most of Corporate America has made gains in the effort to obtain the benefits of racial diversity, including at the executive level.  Not Cisco.  In 2020, not a single African American serves on Cisco's 13-person senior Executive Leadership Team:



1    9.    At Cisco, African Americans are only barely represented at the vice president level

2  (1.8%) or leadership and people manager levels (2.2%).  Moreover, only 3.8% of Cisco's workforce

3  is comprised of African Americans, a barely perceptible change from 3.3% in 2015.  Cisco employs

4  African American workers at a rate that is 70% lower than the ratio of African Americans to the total

5  U.S. population and 10% of the rate at which Cisco employs Asian employees – 37% vs. 3.8%.

6

7    

8

9

10

11

12

13    

14

15

16

17

18

19

20    

21

22

23

24

25

26

27

28

1      10.     Public statements aside, Defendants have not, in fact, promoted racial diversity on

2  Cisco's Board and/or its senior Executive Leadership Team.  Rather than address these deficiencies

3  head-on – by adding African American women and/or men to Cisco's Board and Executive

4  Leadership Team – Defendants have opted to cause Cisco to issue platitudes.  While Cisco's

5  publicly facing communications state that the Company is "committed to" and "embraces" diversity

6  at Cisco, including at the very top, Defendants have declined to carry out the Company's policies

7  and proclamations and have failed to increase racial diversity at Cisco.

8      11.     As a result, and despite its carefully curated image as an industry leader in top

9  leadership diversity, Cisco was recently exposed for being among the 20 largest companies in the

10  United States without a single black person on its Board.  *See* Kerri Anne Renzulli, *The 20 Largest*

11  *Public U.S. Companies Without a Black Person on Their Board*, Newsweek (June 17, 2020),

12  https://www.newsweek.com/20-largest-public-us-companies-without-black-person-their-board-

13  1511319.  A shortage of African American candidates cannot be the answer to Defendants' failure to

14  live up to the Company's professed commitment to "inclusion, diversity, and collaboration" that

15  "starts at the top."  2018 CSR Report at 10.  *See also* Jessica Guynn, *Why are there still so few Black*

16  *executives in America?*, USAToday (Aug. 20, 2020), https://www.usatoday.com/in-

17  depth/money/business/2020/08/20/racism-black-america-corporate-america-facebook-apple-netflix-

18  nike-diversity/5557003002/ ("Since July 30, two other companies that didn't have any Black board

19  members or top executives listed on their proxy statements announced they were adding Black board

20  members.  Bristol Myers Squibb said it was expanding its board from 12 to 14 to add new board

21  members Paula Price and Derica Rice, both of whom are Black. Procter & Gamble announced last

22  week the appointment of new board member Debra Lee, the former CEO of BET Networks.").

23      12.     In May 2020, a McKinsey report concluded that "[t]he business case for inclusion and

24  diversity (I&D) is stronger than ever," finding that "companies in the top quartile outperformed

25  those in the fourth by 36 percent in terms of profitability in 2019."  Vivian Hunt, Sara Prince,

26  Sundiatu Dixon-Fyle & Kevin Dolan, *Diversity wins:  How inclusion matters*, McKinsey &

27  Company, at 3-4 (May 19, 2020) ("*Diversity wins*"), https://www.mckinsey.com/featured-

28  insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters. McKinsey also found that,

"[f]or diverse companies, the likelihood of outperforming industry peers on profitability has increased over time, while the penalties are getting steeper for those lacking diversity."  *Id.* at 3.

13.     Cisco's Board members have certain legal obligations and responsibilities to the Company and its shareholders, including the duty to be truthful and honest and to act consistent with Cisco's public representations about the Company's policies and procedures.  Defendants have failed on both counts.  Today, in 2020, the Cisco Board still has no African Americans.  Nor is any member of the Company's senior Executive Leadership Team African American.

14.     The failure of the Cisco Board to act consistent with Cisco's public representations concerning diversity has adversely impacted the Company.  Instead of actually embracing diversity, Defendants have instead misled Cisco shareholders and the public by making false assertions about the Company's commitment to "diversity" and acted inconsistent with their obligation to increase shareholder returns, which research confirms is attained through more diverse leadership teams.  In doing so, Defendants have committed actionable breaches of fiduciary duty.

15.     Plaintiff's August 5, 2020 pre-suit demand to Cisco's Board comes several years after Defendants first began to publicly represent Cisco as a company that achieves and values top leadership diversity, including in the boardroom.  But as illustrated in ¶7, *supra*, the Cisco Board has been devoid of African Americans in each year since at least 2015.  Notably, when Cisco had opportunities to act consistent with its public representations and add a new person who was racially diverse to its Board, the Board declined to nominate an African American candidate for the position.  Instead, the Board nominated almost exclusively white men and/or women director candidates to Cisco's Board.

16.     African American men and women are proven leaders in every segment of society, including the academy, the armed forces, business, industry, law, healthcare, science, and technology.  Recognizing the diversity of perspectives, skills and talents African American director candidates possess, Fortune 500 companies, including several Silicon Valley technology companies, have African American directors.  But not Cisco.  Still today, in late September 2020, there is not a single African American on Cisco's Board.  Cisco's record on achieving African American board level diversity is a dismal 0-50, meaning, out of 50 unique opportunities to nominate an African

1   American candidate for election to Cisco's Board, Cisco's Board affirmatively declined do so each

2   and every time.  This, despite the Board's public proclamations that Cisco "embraces diversity

3   across the spectrum at every level."  2018 CSR Report at 5.

4          17.    Cisco's Board publicly affirms the Company's commitment to top leadership

5   diversity.  For example, in Cisco's 2019 CSR Report, Defendants stated "[d]iversity, inclusion,

6   collaboration, and technology are fundamental to who we are, how we create the best teams, and

7   how we will succeed in this age of digital transformation."  2019 CSR Report at 38.  Similarly, in

8   Cisco's 2018 CSR Report, Defendants represented Cisco "embraces diversity across the spectrum at

9   every level by using technology to better recruit, hire, and develop diverse talent."  2018 CSR Report

10  at 5.  Towards this end, Cisco's Proxy Statements declare "the Board believes it is important to

11  consider diversity of race, ethnicity, gender, age, education, cultural background, and professional

12  experiences in evaluating board candidates in order to provide practical insights and diverse

13  perspectives."  *See* 2019 Proxy Statement at 5; Cisco Systems, Inc. Proxy Statement (Sch. 14A)

14  (Oct. 24, 2018) ("2018 Proxy Statement") at 5; Cisco Systems, Inc., Proxy Statement (Sch. 14A)

15  (Oct. 25, 2017) ("2017 Proxy Statement") at 5.  Yet, in September 2020, not a single African

16  American man or woman serves on Cisco's Board, and no African Americans have served on

17  Cisco's Board since at least 2015:











  

*Board of Directors*, Cisco Systems, Inc., https://investor.cisco.com/corporate-governance/board-of-directors/default.aspx (last visited Sept. 22, 2020).  Had Cisco's directors actually wanted to rectify this shareholder-wealth-diminishing situation they could have easily done so at any time during the preceding five years.  Or, even after receiving Plaintiff's August 5, 2020 pre-suit demand calling for precisely such relief.  Likewise, Cisco's Board could have added African Americans to Cisco's senior Executive Leadership Team.  But in both situations, the Cisco Board declined to do so.  Accordingly, Plaintiff is entitled pursue this action on behalf of Cisco.

**INTRADISTRICT ASSIGNMENT**

18.     A substantial part of the events and omissions which give rise to the claims in this action occurred in the County of Santa Clara, and as such this action is properly assigned to the San Jose division of this Court.

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction under 28 U.S.C. §1331 because the claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78n(a)).  This Court has exclusive subject matter jurisdiction over the federal securities law claims under §27 of the Exchange Act (15 U.S.C. §78aa) and supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise lack.

20.     This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Cisco maintains its headquarters in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs

1  complained of herein, including Defendants' primary participation in the wrongful acts detailed

2  herein, occurred in this District; and (iv) Defendants have received substantial compensation in this

3  District by doing business here and engaging in numerous activities that had an effect in this District.

4  **PARTIES**

5       22.    Plaintiff City of Pontiac General Employees' Retirement System is and continuously

6  has been a shareholder of Cisco since October 2007.  Plaintiff will adequately and fairly represent

7  the interests of Cisco in enforcing and prosecuting these derivative claims.

8       23.    Nominal party Cisco Systems, Inc. is a California corporation with its executive

9  offices located at 170 West Tasman Drive, San Jose, CA 95134-1706.

10       24.    Defendant Wesley G. Bush ("Bush") has served as a director of Cisco since May

11  2019.  He also has served on the Compensation and Management Development Committee of the

12  Cisco Board.  In 2019, Bush received at least $170,552 in fees and other compensation while failing

13  to act in the best interests of Cisco and its shareholders.  Bush publicly misrepresented Cisco as a

14  company that effectively promotes diversity throughout its ranks, including in the boardroom, when,

15  in fact, it does not.

16       25.    Defendant Mark Garrett ("Garrett") has served as a director of Cisco since 2018.  He

17  also has served on the Nomination and Governance Committee of the Cisco Board.  In 2019, Garrett

18  received at least $365,960 in fees and other compensation while failing to act in the best interests of

19  Cisco and its shareholders.  Garrett publicly misrepresented Cisco as a company that effectively

20  promotes diversity throughout its ranks, including in the boardroom, when, in fact, it does not.

21       26.    Defendant Michael D. Capellas ("Capellas") has served as a director of Cisco since

22  2006.  He also has served on the Nomination and Governance Committee of the Cisco Board.  In

23  2019, Capellas received at least $383,960 in fees and other compensation while failing to act in the

24  best interests of Cisco and its shareholders.  Capellas publicly misrepresented Cisco as a company

25  that effectively promotes diversity throughout its ranks, including in the boardroom, when, in fact, it

26  does not.

27       27.    Defendant John L. Hennessy ("Hennessy") served as a director of Cisco from 2002

28  until December 2018.  He also served on the Nomination and Governance Committee of the Cisco

1   Board.  In 2019, Hennessy received at least $6,000 in fees and other compensation while failing to

2   act in the best interests of Cisco and its shareholders.  Hennessy publicly misrepresented Cisco as a

3   company that effectively promotes diversity throughout its ranks, including in the boardroom, when,

4   in fact, it does not.

5           28.    Defendant Kristina M. Johnson ("Johnson") has served as a director of Cisco since

6   2012.  She also has served on the Compensation and Management Development Committee of the

7   Cisco Board.  In 2019, Johnson received at least $326,960 in fees and other compensation while

8   failing to act in the best interests of Cisco and its shareholders.  Johnson publicly misrepresented

9   Cisco as a company that effectively promotes diversity throughout its ranks, including in the

10  boardroom, when, in fact, it does not.

11          29.    Defendant Roderick C. McGeary ("McGeary") has served as a director of Cisco since

12  2003.  He also has served on the Nomination and Governance and Compensation and Management

13  Development Committees of the Cisco Board.  In 2019, McGeary received at least $380,960 in fees

14  and other compensation while failing to act in the best interests of Cisco and its shareholders.

15  McGeary publicly misrepresented Cisco as a company that effectively promotes diversity throughout

16  its ranks, including in the boardroom, when, in fact, it does not.

17          30.    Defendant Arun Sarin ("Sarin") has served as a director of Cisco since 2009.  He also

18  has served on the Compensation and Management Development Committee of the Cisco Board.  In

19  2019, Sarin received at least $340,960 in fees and other compensation while failing to act in the best

20  interests of Cisco and its shareholders.  Sarin publicly misrepresented Cisco as a company that

21  effectively promotes diversity throughout its ranks, including in the boardroom, when, in fact, it does

22  not.

23          31.    Defendant Brenton L. Saunders ("Saunders") has served as a director of Cisco since

24  2017.  He also has served on the Compensation and Management Development Committee of the

25  Cisco Board.  In 2019, Saunders received at least $322,960 in fees and other compensation while

26  failing to act in the best interests of Cisco and its shareholders.  Saunders publicly misrepresented

27  Cisco as a company that effectively promotes diversity throughout its ranks, including in the

28  boardroom, when, in fact, it does not.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                           - 11 -

32.     Defendant M. Michele Burns ("Burns") has served as a director of Cisco since 2003. She also has served on the Compensation and Management Development and Audit Committees of the Cisco Board.  In 2019, Burns received at least $362,960 in fees and other compensation while failing to act in the best interests of Cisco and its shareholders.  Burns publicly misrepresented Cisco as a company that effectively promotes diversity throughout its ranks, including in the boardroom, when, in fact, it does not.

33.     Defendant Lisa Su ("Su") has served as a director of Cisco since January 2020.  She also has served on the Acquisition Committee of the Cisco Board.  Su publicly misrepresented Cisco as a company that effectively promotes diversity throughout its ranks, including in the boardroom, when, in fact, it does not.

34.     Defendant Steven M. West ("West") served as a director of Cisco from 1996 to December 2019.  He also served on the Audit Committee of the Cisco Board.  In 2019, West received at least $354,960 in fees and other compensation while failing to act in the best interests of Cisco and its shareholders.  West publicly misrepresented Cisco as a company that effectively promotes diversity throughout its ranks, including in the boardroom, when, in fact, it does not.

35.     Defendant Charles H. Robbins ("Robbins") has served as a director of Cisco since 2015.  He also has served as Chief Executive Officer ("CEO") of the Company since 2015.  In 2019, Robbins received at least $25.8 million in salary, stock awards and other compensation while failing to act in the best interests of Cisco and its shareholders.  Robbins publicly misrepresented Cisco as a company that effectively promotes diversity throughout its ranks, including in the boardroom, when, in fact, it does not.

36.     By reason of their positions as Cisco's directors and/or officers and because of their ability to direct and control the Company's business and corporate affairs, Defendants owed Cisco and its shareholders a fiduciary duty to use their utmost ability to control and manage Cisco in an honest and lawful manner.  Toward that end, Cisco's directors and officers owed the Company and its shareholders fiduciary duties to exercise loyalty, good faith, and reasonable supervision over the Company's management, policies, practices, and internal controls.  Moreover, Defendants' fiduciary duties required them to, among other things: (i) ensure that Cisco complied with its legal obligations

and requirements, including legal compliance with the corporations and federal securities laws, as well as acting only within the scope of legal authority and disseminating truthful and accurate statements to Cisco shareholders; (ii) conduct the affairs of the Company in an efficient, business-like manner so as to lawfully maximize the value of the Company's shares; (iii) ensure that Cisco was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations, including the corporations and securities laws; and (iv) refrain from breaching their fiduciary duties to Cisco by adopting initiatives, policies, practices, procedures, and controls inconsistent with their fiduciary duties of care, loyalty, and good faith.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts complained of herein, Defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in the breach of their fiduciary duties.

38.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such action to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS' DUTY TO ACT IN THE BEST INTERESTS OF CISCO AND ITS SHAREHOLDERS

39.     Corporations are one of society's most important institutions.  Without profitable corporations, capitalist economies contract, communities fail, and the general welfare suffers. Diversity in the boardroom and throughout a corporate enterprise is a bulwark against these ills.

40.     Research confirms that firms with greater diversity enjoy greater profitability and create more shareholder wealth.  As such, building a high functioning, diverse board of directors lies within the very heart of a director's fiduciary duty to maximize corporate value to the fullest extent. Declining to do so is not protected by the business judgment rule.

**Enhancing Shareholder Wealth**
**Is a Director's Fundamental Duty**

41.     In early 2016, *The Economist* called shareholder primacy theory "the biggest idea in business," stating "today shareholder value rules business."  *Shareholder Value*, *Analyze this*, The Economist (Apr. 2, 2016).  The idea is not new, however.  As legendary Chicago school economist Milton Freedman succinctly put it in 1962, "corporations have no higher purpose than maximizing profits for their shareholders."  Milton Friedman, *Capitalism and Freedom* (1962).  More specifically, he stated:

> In a free-enterprise, private-property system, a corporate executive is an employee of the owners of the business.  He has direct responsibility to his employers.  That responsibility is to conduct the business in accordance with their desires, which generally will be to make as much money as possible while conforming to their basic rules of the society, both those embodied in law and those embodied in ethical custom.

Milton Friedman, *The Social Responsibility of Business Is to Increase Its Profits*, N.Y. Times Mag. at 1 (Sept. 13, 1970).

42.     Oxford University and Harvard Law School Professors John Armour and Reinier Kraakman described shareholder primacy theory this way in their seminal work *The Anatomy of Corporate Law: A Comparative and Functional Approach*:  "[S]hareholder primacy operates to 'assure that the corporation serves the best interests of its shareholders or, more specifically, to maximize financial returns to shareholders or, more specifically still, to maximize the current market price of corporate shares.'"  John Armour, et al., *What Is Corporate Law?* in *The Anatomy of Corporate Law: A Comparative and Functional Approach* at 23 (3d ed., Oxford Univ. Press).

43.     Delaware embraces shareholder primacy in its corporate law.  As former Delaware Supreme Court Chief Justice Leo E. Strine, Jr. wrote:

> [A] clear-eyed look at the law of corporations in Delaware reveals that, within the limits of their discretion, directors must make stockholder welfare their sole end, and that other interests may be taken into consideration only as a means of promoting stockholder welfare.

Leo E. Strine, Jr., *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability Structure Established by the Delaware General Corporate Law*, Univ. of Penn., Inst. for Law & Econ., Research Paper No. 15-08, at 10 (Mar. 11, 2015) ("Strine, *Dangers of*

1  *Denial*"); *accord Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. 12108-VCL, 2017 WL

2  1437308, at *18 (Del. Ch. Apr. 24, 2017) ("the fiduciary relationship requires that the directors act

3  prudently, loyally, and in good faith to maximize the value of the corporation over the long-term for

4  the benefit of the providers of presumptively permanent equity capital"); *In re Trados Inc. S'holder*

5  *Litig.*, 73 A.3d 17, 42 n.16 (Del. Ch. 2013) ("the standard of fiduciary conduct calls for the board to

6  maximize the value of the corporation for the benefit of the common stock"); *eBay Domestic*

7  *Holdings, Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. Ct. 2010) (same).

8      44.    A director who deviates from shareholder primacy commits a breach of fiduciary duty

9  for which he may be held liable:

10  > Of course, it is true that the business judgment rule provides directors with wide
11  > discretion, and that it enables directors to justify by reference to long run stockholder
   > interests a number of decisions that may in fact be motivated more by a concern for a
   > charity the CEO cares about, or the community in which the corporate headquarters
12  > is located, or once in a while, even the company's ordinary workers, than long run
   > stockholder wealth. But that does not alter the reality of what the law is. *Dodge v.*
13  > *Ford* and *eBay* are hornbook law because they make clear that if a fiduciary admits
   > that he is treating an interest other than stockholder wealth as an end in itself, rather
14  > than an instrument to stockholder wealth, he is committing a breach of fiduciary
   > duty.

15
16  Strine, *Dangers of Denial* at 20.

17  **Diversity Serves the Best Interests of Shareholders**
   **Because It Maximizes Shareholder Wealth**

18      45.    In 2015, McKinsey, one of the world's largest and most prestigious management

19  consulting firms, observed the statistically significant connection between diverse leadership and

20  financial performance, finding that "[c]ompanies in the top quartile for racial/ethnic diversity were

21  35 percent more likely to have financial returns above their national industry median." *Diversity*

22  *Matters* at 1. After examining proprietary datasets for 366 public companies, including financial

23  results and the composition of top management and boards, McKinsey found that "diversity

24  correlates with better financial performance," while the "reverse is also true, companies in the

25  bottom quartile in both gender and ethnicity underperformed the other three quartiles." *Id.* at 3.

26      46.    Moreover, the 2015 McKinsey report found that companies in the top quartile for

27  gender or racial and ethnic diversity are more likely to have financial returns above their national

28

1  industry median, while companies in the bottom quartile in these dimensions are statistically less

2  likely to achieve above-average returns:

> The analysis found a statistically significant relationship between a more diverse leadership team and better financial performance. The companies in the top quartile of gender diversity were 15 percent more likely to have financial returns that were above their national industry median. Companies in the top quartile of racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median. Companies in the bottom quartile for both gender and ethnicity/race were statistically less likely to achieve above-average financial returns than the average companies in the dataset (that is, they were not just not leading, they were lagging). The results varied by country and industry. Companies with 10 percent higher gender and ethnic/racial diversity on management teams and boards in the US, for instance, had EBIT that was 1.1 percent higher; in the UK, companies with the same diversity level had EBIT that was 5.8 percent higher. Moreover, the unequal performance across companies in the same industry and same country implies that diversity is a competitive differentiator that shifts market share towards more diverse companies.

11  *Id.* at 1.

12      47.   In 2018, McKinsey updated its research and again found that more diverse firms

13  enjoy greater shareholder returns than less diverse firms, finding that ethnically diverse companies

14  are 35% more likely to financially outperform ethnically homogeneous ones. Vivian Hunt, Sara

15  Prince, Sundiatu Dixon-Fyle & Lareina Yee, *Delivering through Diversity*, McKinsey & Company,

16  at 8 (Jan. 2018) ("*Delivering through Diversity*"), http://www.insurance.ca.gov/diversity/41-

17  ISDGBD/GBDExternal/upload/ McKinseyDeliverDiv201801-2.pdf. As McKinsey explained:

> We first established a positive, statistically significant correlation between executive team diversity and financial performance in our 2015 *Why Diversity Matters* report (using 2014 diversity data). We find this relationship persists in our expanded, updated, and global 2017 data set. In *Why Diversity Matters* we found that companies in the top quartile for gender diversity on their executive teams were 15% more likely to experience above-average profitability than companies in the 4th quartile. Almost exactly three years later, this number rose to 21% and continued to be statistically significant. For ethnic/cultural diversity, the 2014 finding was a 35% likelihood of outperformance, comparable to the 2017 finding of a 33% likelihood of outperformance on EBIT margin, both statistically significant . . . .

24  *Id.* (footnotes omitted).

25      48.   Addressing boardroom diversity in particular, the 2018 *Delivering through Diversity*

26  report found that "[e]thnic and cultural diversity's correlation with outperformance on profitability

27  was also statistically significant at Board level," making companies with greater ethnic and cultural

28  board diversity 43% more likely to enjoy higher profits. *Id.* at 13. In other words, diversity provides

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              - 16 -

increased shareholder returns, which is in the best interests of the corporation and its shareholders. As McKinsey further explained:

> We found that companies with the most ethnically/culturally diverse Boards worldwide are 43% more likely to experience higher profits.  We also found a positive correlation between ethnic/cultural diversity and value creation at both the executive team and Board levels, though the relationship is not statistically significant.  It may be the case that overall, the picture on top-team diversity globally is more complex due to significant geographic differences in the cultural contexts in which the companies we studied operate.

> Overall, our findings that ethnic and cultural diversity on executive teams continues to correlate strongly with company financial performance support the argument that there is value in promoting ethnic/cultural diversity in company top teams around the world.  We hypothesize that, for companies, addressing the challenge of building an inclusive company culture across cultural differences could significantly strengthen organizational effectiveness.   Further, ethnic/cultural diversity at the highest levels of company leadership could serve as a signal to employees and other stakeholders that the organization truly understands and values the community and customers that they serve.

*Id.*

49.    And, in May 2020, McKinsey reported that "[t]he business case for inclusion and diversity (I&D) is stronger than ever," finding "that companies in the top quartile outperformed those in the fourth by 36 percent in terms of profitability in 2019" and that, "[f]or diverse companies, the likelihood of outperforming industry peers on profitability has increased over time, while the penalties are getting steeper for those lacking diversity." *Diversity wins* at 3-4.  As McKinsey explained:

> *Diversity Wins* is the third in a McKinsey series investigating the business case for diversity, following *Why Diversity Matters* (2015) and *Delivering through Diversity* (2018).  This report shows not only that the business case remains robust, but also that the relationship between diversity on executive teams and the likelihood of financial outperformance is now even stronger than before.  These findings are underpinned by our largest data set to date, encompassing 15 countries and more than 1,000 large companies.

> *            *            *

> In the case of ethnic and cultural diversity, the findings are equally compelling. We found that companies in the top quartile outperformed those in the fourth by 36 percent in terms of profitability in 2019, slightly up from 33 percent in 2017 and 35 percent in 2014.  And, as we have previously found, there continues to be a higher likelihood of outperformance difference with ethnicity than with gender.

> *            *            *

1
2
3
4

> This growing polarization between high and low performers is reflected in an increased likelihood of a performance penalty. In 2019, fourth-quartile companies for executive-team gender diversity were 19 percent more likely than companies in the other three quartiles to underperform on profitability. This is up from 15 percent in 2017 and nine percent in 2015. And for companies in the fourth quartile of both gender and ethnic diversity the penalty is even steeper in 2019: they are 27 percent more likely to underperform on profitability than all other companies in our data set.

5 *Id*. (footnote omitted).

6   50.   These consistent findings demonstrate that firms with greater diversity outperform

7 their peers by a significant margin. Diversity is in the best interests of a corporation and its

8 shareholders. Cisco recognizes this – at least on paper. "At Cisco, diversity, inclusion, and

9 collaboration are fundamental to who we are, how we create the best teams, and how we drive

10 success." Cisco Systems, Inc., 2019 Annual Report at 7. In practice, however, this appears to be

11 only lip-service, as Cisco remains one of the few large publicly traded companies in the United

12 States without a single male or female African American director in 2020.

**BILLIONS IN POTENTIAL
SHAREHOLDER WEALTH SQUANDERED**

13
14

**The Cisco Board of Directors and
Executive Leadership Team**

15

16   51.   The lack of racial diversity at the top at Cisco is significant. In 2020, Cisco enjoys

17 the dubious distinction of being one of only a handful of large publicly traded companies in the

18 United States without an African American director. The Company's 13-person Executive

19 Leadership Team likewise lacks a single black member. The members of the Cisco 2019 Board are:

20
21
22
23
24
25
26
27
28




52.     The members of the Executive Leadership Team are:




**Defendants' False Statements About the
Company's Top Leadership Diversity**

53.     Privately, Defendants have consistently declined the opportunity to appoint African American men or women to Cisco's Board and/or its Executive Leadership Team.  Publicly, however, Defendants, in pursuit of the accolades and awards that affirm true diversity leadership, have falsely portrayed Cisco as a leader in top leadership diversity and as a company that effectively promotes and achieves diversity across its enterprise, including at the top.

**False Statements About Racial Diversity
on the Company's Website**

54.     For example, Cisco's website not only recognizes diversity to be a key to success, but also highlights Cisco's efforts to accelerate diverse talent acquisition across the enterprise:

**Accelerating Diverse Talent**

At Cisco, we believe that everyone plays a role in accelerating diversity, inclusion, and collaboration.

Across our global company, we've driven broad improvements in overall representation that have resulted in the most diverse Cisco ever. ***Today, we have one of the most diverse executive leadership teams in our industry***.  And we're just getting started.

\*       \*       \*

Our bold new strategies for accelerating diversity begin with creating new ways to find extraordinary talent.  We've designed an innovative framework that includes:

• Introducing new tools and technologies to help us accurately map the talent market

• Creating job postings that attract highly qualified diverse candidates

1              •       Expanding the diversity within our interview panels.

2   *About Us*, Cisco Systems, Inc., https://www.cisco.com/c/en/us/about/inclusion-diversity/us.html (last

3   visited Sept. 18, 2020).

4              55.    The "Diverse Talent Accelerators" page of the Company's website further states:

5   **Diverse Talent Accelerators Initiative**

6              Our innovative Diverse Talent Accelerators initiative is transforming the way
    Cisco finds, attracts, and hires top diverse talent.

7

8              Through powerful new analytics, we can now accurately map the talent
    market and adjust our searches to target diverse candidates within specific job
    families and experience levels.  With new insights come new opportunities.  To
9   accelerate diversity, we're embedding some innovative new solutions within our
    hiring practices.

10

11  *Diverse Talent Accelerators*, Cisco Systems, Inc., https://www.cisco.com/c/dam/en_us/about/

12  inclusion-collaboration/diverse-talent-accelerator.pdf (last visited Sept. 18, 2020).

13             56.    Similarly extolling the power of inclusion and diversity at Cisco, the "About Us"

    page of Cisco's website states:
14

15  **Inclusion is the power of people – connected**

16             Cisco sees inclusion and diversity as essential to fueling what we call the
    power of connection.

17             At Cisco, we see inclusion as a bridge – a way to connect diverse
    perspectives.  To spark new ideas, explore new possibilities, tap into the power of
18  digital transformation, and inspire innovation.

19             We're inventing new ways to multiply the power of our people and
    developing innovative solutions to some of our most business-critical challenges and
20  opportunities.  We're expanding our commitment to fair pay.  Accelerating our
    diverse talent.  Investing in our emerging diverse leaders.  Creating new realms of
21  inclusion through technology, as seen in our Cisco LifeChanger and Connected
    Health and Education programs.  Partnering across the globe to multiply our impact.
22  And taking a stand for social justice throughout our communities.

23  *About Us*, Cisco Systems, Inc., https://www.cisco.com/c/en/us/about/inclusion-diversity/us.html (last

24  visited Sept. 18, 2020).

25

26

27

28

**False Statements About Racial Diversity
in the Company's Proxy Statements**

57.     Additionally, Defendants falsified the Company's official SEC filings.  In particular, while under the stewardship of Defendants, the Company's Proxy Statements repeatedly misrepresented that Cisco effectively promotes and achieves inclusion and diversity.

58.     For example, in the 2019 Proxy Statement, Defendants stated:  "Cisco's Board of Directors is composed of skilled and diverse directors and has established robust corporate governance practices and policies."  2019 Proxy Statement at 1.

59.     Defendants further stated, with respect to "[b]oard [r]efreshment," *i.e.*, the nomination of directors, that the Cisco Board prizes "diverse perspectives" and, therefore, "believes it is important to consider diversity of race, ethnicity, gender, age, education, cultural background, and professional experiences in evaluating board candidates in order to provide practical insights and diverse perspectives."  *Id.* at 4-5.  More specifically, they stated:

**Board Refreshment**

> ***Cisco regularly evaluates the need for board refreshment***.  The Nomination and Governance Committee, and the Board of Directors, are focused on identifying individuals whose skills and experiences will enable them to make meaningful contributions to the shaping of Cisco's business strategy. . . .
>
> As part of its consideration of director succession, the Nomination and Governance Committee from time to time review the appropriate skills and characteristics required of board members such as diversity of business experience, viewpoints and personal background, and diversity of skills in technology, finance, marketing, international business, financial reporting and other areas that are expected to contribute to an effective Board of Directors.  Additionally, due to the global and complex nature of our business, ***the Board believes it is important to consider diversity of race, ethnicity, gender, age, education, cultural background, and professional experiences in evaluating board candidates in order to provide practical insights and diverse perspectives***.
>
> ***The Nomination and Governance Committee and the Board will regularly evaluate the key qualifications, skills and attributes required in order to effectively refresh the Board*** with engaged and dynamic leaders with a proven business track record ***who will bring fresh perspectives*** to the Board while maintaining the productive working dynamics and collegiality of the Board.

*Id.*

1       60.    Additionally in the 2019 Proxy Statement, Defendants identified "inclusion and

2 diversity" as one of the essential core elements driving Cisco's purpose, culture, and investments,

3 stating:

4         Corporate social responsibility ("CSR") is **core to our purpose, our culture,**
         **and how we invest**.  We focus on the issues that align with our business strategy, and

5         where we can have the greatest potential for global impact, **including inclusion and**
         **diversity**, supporting local community programs, and reducing our environmental

6         impact.

7 *Id.* at 5.

8       61.    Cisco's 2017 and 2018 Proxy Statements contain similar statements representing that

9 the Company effectively promotes and achieves inclusion and diversity.  For example, in the 2018

10 Proxy Statement, Defendants stated: "Cisco's Board of Directors is composed of skilled and diverse

11 directors and has established robust corporate governance practices and policies in order to promote

12 shareholder returns," and "the Board believes it is important to consider diversity of race, ethnicity,

13 gender, age, education, cultural background, and professional experiences in evaluating board

14 candidates in order to provide practical insights and diverse perspectives." 2018 Proxy Statement at

15 1, 5.

16       62.    Similarly, in the 2017 Proxy Statement, Defendants stated that "Cisco's Board of

17 Directors is composed of skilled and diverse directors" and declared the Board's intention to

18 "promote shareholder returns."  2017 Proxy Statement at 1.  Defendants further stated that "Cisco

19 regularly evaluates the need for board refreshment."  *Id.* at 5.  Accordingly, "[a]s a part of its

20 consideration of director succession," the Board seeks to attain "diverse perspectives" and "believes

21 it is important to consider diversity of race, ethnicity, gender, age, education, cultural background,

22 and professional experiences in evaluating board candidates."  *Id.*

23 **False Statements About Racial Diversity in the**
**Company's Corporate Social Responsibility Reports**

24

25       63.    Each year, at the direction of the Board, the Company releases its annual Corporate

26 Social Responsibility ("CSR") Report.  In these reports, Defendants expressly recognize the

27 correlation between diversity and increased shareholder wealth:  "Amid this age of digital

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  transformation, we believe inclusion, diversity, and collaboration make us more innovative, more

2  agile, and ultimately more successful."  2018 CSR Report at 10.

3       64.     Additionally, in the CSR Reports, Defendants have repeatedly represented to

4  shareholders and the public that Cisco effectively promotes diversity throughout the Company.  For

5  example, the 2019 CSR Report states:

- At Cisco, *we are committed to full-spectrum diversity*, inclusive of gender, ethnicity, race, orientation, age, ability, veteran status, religion, culture, background, experience, strengths, and perspectives.

- *Diversity, inclusion, collaboration, and technology are fundamental to who we are, how we create the best teams, and how we will succeed in this age of digital transformation*.

- Our work is focused on achieving four key business outcomes:  *Diverse leadership* and workforce, *inclusive and collaborative* culture, community engagement and impact, and inclusion and collaboration industry leadership.

12  2019 CSR Report at 38.

13       65.     The 2019 CSR Report further states that Cisco views "inclusion and collaboration as

14  the bridge to connect diverse perspectives" and that "a Conscious Culture," committed to "[f]ull-

15  spectrum diversity" and "[i]nclusive culture," is fundamental in achieving competitive success in the

16  marketplace and sustainable shareholder returns:

**The foundation of a Conscious Culture**

*We view inclusion and collaboration as the bridge to connect diverse perspectives*. Spark new ideas.  Imagine new possibilities. Challenge the status quo. Inspire innovation. And unleash the full power and potential of our people.

This is the heart of our approach to creating a Conscious Culture where everyone takes responsibility for fostering an inclusive, collaborative, and respectful environment.  Cisco welcomes all people into life and work.  Our commitment has two components:

- *Full-spectrum diversity*.  Inclusive of gender, ethnicity, race, orientation, age, ability, veteran status, religion, culture, background, experience, strengths, and perspectives.

- *Inclusive culture*.  A place where people feel welcomed, valued, respected, accepted, and heard, and are enabled by our technology to fully participate in the business.

Our definition of diversity and inclusion is expansive, intersectional, and continually evolving.

> ***Our culture sets us apart, starting at the top with our diverse Executive Leadership Team (ELT)***.  We're proud to say that women make up 46 percent of our ELT.  And 62 percent is diverse in terms of gender and/or ethnicity, making us an industry leader in this area.

**Cisco sees diversity differently**

> We've made big shifts in how we approach diversity.  Years ago, our discipline focused on government compliance.  Later, we worked to create a workplace where all people could belong and thrive.  Today, we're reaching new heights, welcoming people into work by using our collaboration technology and enabling them to fully participate in our business.

> We created the Office of Inclusion & Collaboration in 2014, choosing a name that encompasses our one-of-a-kind approach.  Our technologies are central to our work, allowing everyone to have a seat at the table, even if they're not sitting in the same room.  Today, the office helps Cisco's business in four main ways:

> ***Workforce***.  Helping us find and keep diverse people at every level.

> ***Culture***.  Promoting a Conscious Culture where everyone can contribute.

> ***Community***.  Making positive impact a habit with an inclusive approach.

> ***Leadership***.  Sharing our inclusive programs and practices across our industry.

*Id*. at 39-40.

66.     As in Defendants' other public facing statements, the 2019 CSR Report highlights the Company's purported efforts to accelerate diverse talent acquisition throughout the Company.  Specifically, highlighting the Company's "Diverse Talent Accelerator" ("DTA"), a suite of tools designed to help minimize bias in candidate searches and interviews, the 2019 CSR Report states:

**Accelerating diverse representation**

> DTA is delivering results. Cisco achieved record levels of representation of women, African American/Black, and Hispanic/Latino employees due to record levels of hiring.  In FY19, a record 31 percent of new hires were women, a 2 percentage point increase from FY18.  We also saw a 4.8 percent increase in women in director and manager roles.  All organizations are hiring above baseline share for women in both technical and nontechnical roles. Baseline Share is the portion of the global talent market that has the skills and experience levels for the job families Cisco targets.  We also increased representation for African American/Black employees to 3.8 percent and Hispanic/Latino employees to 5.6 percent.  Representation of African American/Black employees and Hispanic/Latino employees has increased every year since 2016.  The improvement in representation for these ethnicities has been broad-based and is being driven by record-level hiring, with African American/Black hiring at 5.1 percent and Hispanic/Latino hiring at 6.7 percent.  While we have had record levels of hiring, we know that we still have work to do. We will continue to drive efforts outlined in our Inclusive Workforce Plans and look forward to sharing continued progress in future CSR reports.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 24 -

1  *Id.* at 40-41.

2      67.    Cisco's 2017 and 2018 CSR Reports contain similar statements representing that the

3  Company effectively promotes and achieves inclusion and diversity.  For example, the 2018 CSR

4  Report states that "[d]iversity, inclusion, and collaboration are fundamental to who we are, how we

5  create the best teams, and how we will succeed in this age of digital transformation," and that "[o]ur

6  vision for the future is to create exponential value for Cisco, our employees, customers, partners, and

7  communities through the intersection of diversity, inclusion, collaboration, and technology."  2018

8  CSR Report at 49.

9      68.    Emphasizing diversity gains within Cisco's senior executive leadership ranks, the

10  2018 CSR further stated:

11          We are the most diverse Cisco since 1998.  ***We are delivering on our vision
           of accelerating full-spectrum diversity-inclusion of gender, generation, race,***
12         ***ethnicity, orientation, ability, nationality, religion, veteran status, background,***
           ***culture, experience, strengths, and perspectives***.  It starts at the top, were 42 percent
13         of our Executive Leadership Team (ELT) is women, and 58 percent is diverse in
           terms of gender or ethnicity, making Cisco an industry leader in top leadership
14         diversity.

15  *Id.* at 50.  The "message from Chuck Robbins" accompanying the 2018 CSR Report echoes these

16  sentiments, stating:  "We are also focused on building a thriving workforce that ***embraces diversity***

17  across the spectrum ***at every level*** by using technology to better recruit, hire, and develop diverse

18  talent."  *Id.* at 5.

19      69.    Cisco's 2017 CSR Report also highlights Cisco's concentration on "inclusion and

20  diversity," particularly at the senior executive leadership level.  Specifically, the 2017 CSR Report

21  states:

22      **Inclusion and Collaboration**

23          We believe a focus on inclusion is not simply the right thing to do – it really
           works. Inclusion is the bridge that connects diverse perspectives, challenges the
24         status quo, and unlocks the full potential of our people. When we truly connect
           people with different backgrounds, abilities, genders, generations, cultures,
25         ethnicities, orientations, work styles, and points of view, we can collaborate at
           exciting new levels.

26                              *       *       *

27

28

1

   We're all in – starting at the top.  ***Our executive leadership team is one of***

2  ***the most diverse in our industry, setting a powerful precedent and demonstrating that inclusion is fundamental to who we are – and where we're going***.

3  **46% diversity on our Executive Leadership Team**.

4     In the past year, we've delivered innovative solutions to some of our most

5  business-critical challenges and opportunities – like expanding our commitment to fair pay, accelerating diverse talent, and taking a stand for social justice throughout our communities.

6

7  Cisco Systems, Inc., 2017 Corporate Social Responsibility Report at 45.

   **The Statements About Cisco's Racial**

8  **Diversity Were Knowingly False**

9     70.     While many other Silicon Valley companies have at least one African American on

10 their boards of directors, including companies such as Apple, Inc., HP Inc., PayPal, Inc., and

11 Salesforce.com, in 2020, Cisco still does not have a single African American man or woman on its

12 Board.  Cisco's senior leadership ranks are likewise devoid of any African Americans.

13    71.     Instead of pursuing racial diversity on the Board and elsewhere within the Company,

14 Defendants have not only made, or caused Cisco to make, untrue statements about Cisco's

15 commitment to diversity, but also have approved false statements that Cisco has been successful in

16 those efforts.  For example, the Company filed its 2019 Proxy Statement with the SEC on October

17 22, 2019, after it was approved by directors Burns, Bush, Capellas, Garrett, Johnson, McGeary,

18 Robbins, Sarin and Saunders.  And the Company filed its 2018 Proxy Statement with the SEC on

19 October 24, 2018, after it was approved by directors Burns, Capellas, Garrett, Hennessy, Johnson,

20 McGeary, Robbins, Sarin, Saunders, and West.  The 2019 and 2018 Proxy Statements misleadingly

21 used the phrase "diversity of business experience, viewpoints and personal background" to suggest

22 that the Nomination and Governance Committee has a goal of achieving actual diversity on the

23 Board by seeking to achieve representation of diverse persons – *i.e.*, African Americans.  2019 Proxy

24 Statement at 14; 2018 Proxy Statement at 14.

25    72.     Moreover, the representation in the 2019 and 2018 Proxy Statements that "the Board

26 believes it is important to consider diversity of race, ethnicity, gender, age, education, cultural

27 background, and professional experiences in evaluating board candidates in order to provide

28 practical insights and diverse perspectives" is misleading because a reasonable reading of that phrase

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                      - 26 -

1   conveys that the Company is actively seeking to achieve racial diversity on its Board.  2019 Proxy

2   Statement at 14; 2018 Proxy Statement at 14.  Despite highlighting "race" as an important factor to

3   achieving "diverse perspectives," the fact remains that Cisco has no black Board members, and no

4   African American has served on Cisco's Board since at least 2015.  The undisclosed truth is,

5   therefore, that while Cisco may maintain a policy that states it is attempting to bring racially diverse

6   candidates into its director nominee pool, it has established through action (or lack thereof) that it

7   either has no intention of actually nominating such persons to its Board or is engaged in efforts to

8   thwart the nomination of such persons and prefers applicants other than African Americans in the

9   pool.

10         73.     Indeed, elsewhere in the Proxy Statements the Company lists the following factors

11   that are considered by the Nomination and Governance Committee when selecting Board candidates:

12   Leadership, Technology, Financial Experience, Global Business, ***Gender/Ethnic Diversity***, Sales

13   and Marketing, Academia, and Public Company Board Experience.  Specifically, the 2019 Proxy

14   Statement states:



2019 Proxy Statement at 5.

         74.     The 2018 Proxy Statement listed similar factors considered by Cisco when

nominating director candidates:

2018 Proxy Statement at 5. As is evident, racial diversity is not among the relevant factors the Nomination and Governance Committee lists as considerations in its decisions with respect to Board nominees.

**The Compensation and Management Development Committee's Role in Making Cisco's Non-Racially Diverse Board**

75. Cisco directors Burns, Bush, Johnson, McGeary, Sarin, and Saunders served on Cisco's Compensation and Management Development Committee (or its predecessor) between 2015 and 2020. The Charter of the Compensation and Management Development Committee states that the Committee's "basic responsibility is to review the performance and development of the Company's management in achieving corporate goals and objectives and to assure that the Company's executive officers . . . are compensated effectively in a manner consistent with the strategy of the Company, competitive practice, sound corporate governance principles and shareholder interests[, and] [t]oward that end, the Committee will review and approve all compensation to executive officers." Compensation and Management Development Committee Charter at 1. Further, in the 2019 Proxy Statement, the Compensation and Management Development Committee states that Cisco's executive compensation philosophy is "pay-for-performance":

> The core of Cisco's executive compensation philosophy and practice continues to align real pay delivery with performance. Cisco's executive officers are compensated in a manner consistent with Cisco's business strategy, competitive practice, sound corporate governance principles, and shareholder interests and concerns. We believe our compensation program is strongly aligned with the long-term interests of our shareholders.

2019 Proxy Statement at 20.

76. However, the specific targets/objectives underlying the four "Individual Performance Factors" ("IPF") used by the Compensation and Management Development Committee to determine annual CEO compensation do not include diversity. Instead, the targets focus on "Leadership," "Innovation / Strategic Planning," "Execution," and "Contribution to Financial Goals":

> In determining the appropriate IPF for each individual executive officer participant, the Compensation Committee considered performance in the areas of leadership, innovation/strategic planning, execution, and contributions to Cisco's

achievement of its financial goals.  Below are the fiscal 2019 goals for each named executive officer for the various categories.

| Named Executive Officer | Leadership (1 to 5 Points) | Innovation / Strategic Planning (1 to 5 Points) | Execution (1 to 5 Points) | Contribution to Financial Goals (1 to 5 Points) |
|---|---|---|---|---|
| Charles H. Robbins | • Establish and maintain a high-performing leadership team known for delivering exceptional results and modeling Cisco's culture<br><br>• Attract top talent, internally and externally, critical to Cisco's current and future needs<br><br>• Create and maintain employee and leader loyalty resulting in retention of critical employees and leaders<br><br>• Lead Cisco's culture change | • Accelerate innovation and solutions that meet customer current and future needs<br><br>• Accelerate delivery of cloud-based solutions<br><br>• Drive multicloud message / understanding to our customers / partners | • Oversee the execution of the most critical transitions for the company<br><br>• Drive the necessary talent changes quickly – new sales, engineering, services & operations leadership<br><br>• Drive value creation through M&A and R&D yield.<br><br>• Increase market share in networking, security and collaboration | • Achieve or exceed the approved Cisco FY19 financial plan<br><br>• Deliver on market guidance<br><br>• Deliver TSR increase above peers<br><br>• Achieve Cisco gross margins in-line with or exceeding approved targets<br><br>• Achieve Cisco operating margins in-line with or exceeding targets |

*Id.* at 28-29.

**The Nomination and Governance Committee's Role in Making Cisco's Non-Racially Diverse Board**

77.     The Charter of the Nomination and Governance Committee states that the Committee "shall recommend candidates for election to the Company's Board of Directors."  Nomination and Governance Committee Charter at 1.  At all relevant times, directors Capellas, Garrett, Hennessy, and McGeary served on the Cisco Board's Nomination and Governance Committee.  The Company's 2019 Proxy Statement further states that the goal in nominating individuals to serve on

the Cisco Board is to attain "diverse perspectives," and, therefore, "it is important to consider diversity of race, ethnicity, gender, age, education, cultural background, and professional experiences in evaluating board candidates in order to provide practical insights and diverse perspectives." 2019 Proxy Statement at 14. Cisco's 2019 Proxy Statement states further still that to broaden its reach, "the Nomination and Governance Committee considers nominees recommended by directors, officers, employees, shareholders and other," including "consultants or third-party search firms." *Id.*

78.     This statement is designed to convey to Cisco investors and the public that Cisco actively promotes "inclusion and diversity" at all levels of the Company. But, in fact, Defendants have made no real effort to promote racial diversity on the Board. Rather, Cisco has the dubious distinction of being one of the few remaining large publicly traded companies in 2020 that has declined to nominate a single African American director to its Board in any of the last five years.

79.     Cisco's overall workforce representation of African Americans fares little better. Although African Americans comprise 13.4% of the total U.S. population, no African Americans serve on the Company's senior Executive Leadership Team and African Americans make up only 3.8% of Cisco's total workforce. Likewise, only 1.8% of Cisco's vice presidents are African Americans while only 2.2% of Cisco's employees in leadership and people manager positions are black.

80.     This lack of diversity has contributed to economic disparities at Cisco. For example, in 2018, the Company's CEO pay was 160 times as high as the median pay of all other employees:

> As determined in accordance with SEC rules, the fiscal 2018 annual total compensation was $21,284,339 for our CEO as reported in the Summary Compensation Table and $132,764 for our median employee, and the ratio of these amounts is 160 to 1.

2018 Proxy Statement at 58. In 2019, the Company's CEO pay increased to 181 times as high as the median pay of all other employees:

> As determined in accordance with SEC rules, the fiscal 2019 annual total compensation was $25,829,833 for our CEO as reported in the Summary Compensation Table and $142,593 for our median employee, and the ratio of these amounts is 181 to 1.

2019 Proxy Statement at 53.  The absence of significant performance metrics based on achievements in diversity in executive compensation plans can spur economic disparities across an enterprise, as reflected by Cisco's dramatic CEO pay ratio of 160 to 1 in 2018, which only increased in 2019 to 181 to 1.

81.     Leading Fortune 500 companies and top business schools have tied executive pay to a myriad of business goals, like revenues, profits, share price, and talent acquisition.  For example, "[a]chieving diversity goals helps determine one-sixth of the cash bonus of Microsoft's chief executive, Satya Nadella," while at Uber, "[d]iversity targets are embedded in the stock compensation of its chief executive, Dara Khosrowshahi, accounting for a fourth of his performance-based stock awards."  Peter Eavis, *Want More Diversity? Some Experts Say Reward C.E.O.s for It*, N.Y. Times, July 14, 2020.  As *The New York Times* reported, "[m]aking diversity targets part of compensation and disclosing them would not just give top executives a financial incentive to hire and promote more Black and Latino people, but also provide a public scorecard that employees and shareholders could use to determine whether companies were following through on their commitments."  *Id.*

82.     Defendants have declined to link CEO pay to diversity, however.  Financial disincentives to recruit, hire, promote and retain African Americans at senior levels at Cisco, including in the boardroom, have harmed, and continue to harm, the Company and its shareholders by, among other things, adversely impacting shareholder returns.  Instead of acknowledging the problem and demanding change, Defendants have instead issued false statements claiming success in achieving diversity and inclusion in the face of this huge wealth gap.

**Cisco's Majority Voting Rules, as Applied, Discourage
the Nomination of Racial Minorities to the Board**

83.     Cisco's Proxy Statements state that the Company's bylaws and corporate governance policies provide for a majority voting standard in uncontested elections of directors.  Therefore, "in an [uncontested] election . . . , a nominee for director will be elected to the Board of Directors to serve until the next annual meeting of shareholders, . . . if the number of shares voted for the nominee exceeds the number of shares voted against the nominee and also represents the affirmative

vote of a majority of the required quorum." 2019 Proxy Statement at 18. But Cisco's facially neutral majority voting rule, as applied by Defendants, operates to entrench current directors in office and thus prevents the necessary "refreshment" that would allow African Americans an opportunity to be fairly considered for election to the Cisco Board. As a result, the application of the Company's corporate governance policies by Defendants has enabled them to preserve a lack of racial diversity on the Board.

84.     Moreover, the Proxy Statements were false and misleading because they failed to disclose that the effect of the majority voting rules, as applied by Defendants, inhibited the consideration of African Americans for appointment/election to the Cisco Board. These material omissions would have been material to a shareholder's decision regarding whether to re-elect the incumbent directors at the annual meeting. The false Proxy Statements harmed the Company by interfering with the mechanisms for the election of directors by shareholders. As a result of the false or misleading Proxy Statements, Cisco shareholders voted to re-elect Defendants to the Board each year.

**The Absence of Term Limits Discourages the Nomination of Racial Minorities to the Board**

85.     Cisco's Proxy Statements reveal that the Company does not have term limits for directors. But the unstated purpose of the lack of term limits at Cisco is to entrench current directors in office, which effectively prevents African Americans from having a fair opportunity to be considered, let alone elected, to the Board. To attempt to justify this position, Defendants have resisted efforts to appoint new members to the Board by claiming that individuals who have served on the Cisco Board for, in some cases, over a decade have experience that is valuable to the Company.

86.     In practice, however, excessive tenure for directors does not serve the best interests of the corporation, as demonstrated by leading academics and professionals in the field of best corporate governance principles. A report by the Harvard Law School Forum on Corporate Governance, entitled "Board Refreshment Trends at S&P 1500 Firms," noted that:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors –

with multiple answers allowed – would give rise to concern about a board's nominating and refreshment processes. Among the 120 institutional investors (one-third of whom each own or manage assets in excess of $100 billion) who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic.  Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.

Jon Lukomnik, *Board Refreshment Trends at S&P 1500 Firms*, Harvard Law School Forum on Corporate Governance (Feb. 9, 2017), https://corpgov.law.harvard.edu/2017/02/09/board-refreshment-trends-at-sp-1500-firms.

87.     Defendants' refusal to adopt director term limits and to appoint black members to the Board betrays an improper and far-too-long-unchallenged pretext for denying African Americans a seat on the Cisco Board.  This has harmed Cisco by allowing Defendants to perpetuate a lack of racial diversity on the Cisco Board (and on Cisco's senior Executive Leadership Team).

88.     Moreover, the Proxy Statements were false and misleading because they did not disclose the true reasons and effect, as applied, of Cisco's lack of term limits.  These omitted facts, had they been disclosed, would have been highly material to Cisco shareholders' decisions regarding whether to re-elect the Board nominees and vote in favor or against the "say on pay" executive compensation proposals.  Diversity and inclusion are valued very highly by shareholders.  The false Proxy Statements harmed the Company by interfering with the mechanism for electing directors to the Board.  As a result of the false or misleading statements in the Proxy Statements, Cisco shareholders voted to re-elect Defendants to the Board each year.

**Defendants Have Enriched Themselves at the Expense
of Cisco's Shareholders by Making Misleading Statements
About Cisco's Commitment to Diversity**

89.     In addition to denying Cisco the substantial increases in shareholder value enjoyed by companies with greater board diversity, by entrenching themselves on Cisco's Board, Defendants have benefited financially by paying themselves millions of dollars in cash and stock awards each year.  *See Delivering through Diversity* at 13 ("We found that companies with the most ethnically/culturally diverse Boards worldwide are 43% more likely to experience higher profits.").

90. The Charter of the Nomination and Governance Committee states that its members shall, among other things, "[i]dentify and review candidates for the Board and recommend to the full Board candidates for election to the Board." Nomination and Governance Committee Charter at 1. The Charter also states that the Nomination and Governance Committee "may engage consultants or third-party search firms to assist in identifying and evaluating potential nominees." *Id*. Similarly, with regard to the criteria for the selection of directors, the 2019 Proxy Statement states:

> As part of its consideration of director succession, the Nomination and Governance Committee from time to time reviews, including when considering potential candidates, the appropriate skills and characteristics required of board members, including factors that it seeks in board members such as diversity of business experience, viewpoints and personal background, and diversity of skills in technology, finance, marketing, international business, financial reporting and other areas that are expected to contribute to an effective Board of Directors. In evaluating potential candidates for the Board of Directors, the Nomination and Governance Committee considers these factors in the light of the specific needs of the Board of Directors at that time. Additionally, due to the global and complex nature of our business, the Board believes it is important to consider diversity of race, ethnicity, gender, age, education, cultural background, and professional experiences in evaluating board candidates in order to provide practical insights and diverse perspectives.

2019 Proxy Statement at 14.

91. At all relevant times, directors Capellas, Garrett, Hennessy, and McGeary served on the Nomination and Governance Committee of the Cisco Board. But rather than uphold Cisco's commitment to accelerate diversity at the top in the selection criteria for new board members, Capellas, Garrett, Hennessy, and McGeary chose instead to perpetuate Cisco's exclusion of black directors under the pretext that the existing members constitute a "diverse" board. Consequently, many qualified black candidates who would have allowed Cisco and its shareholders to benefit from the perspectives of an African American on the Cisco Board have been excluded. The following chart sets forth the compensation earned by Cisco directors in 2019:

### *Fiscal 2019 Total Director Compensation*

The following table provides information as to compensation earned by the non-employee directors during fiscal 2019.

#### Director Compensation

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) (1) | All Other Compensation ($) | Total ($) |
|------|------|------|------|------|
| Carol A. Bartz (2) | $ 6,000 | $ — | — | $ 6,000 |
| M. Michele Burns | $ 138,000 | $ 224,960 | — | $ 362,960 |
| Wesley G. Bush | $ 44,738(3) | $ 125,814 | — | $ 170,552 |
| Michael D. Capellas | $ 159,000(3) | $ 224,960 | — | $ 383,960 |
| Mark Garrett | $ 141,000 | $ 224,960 | — | $ 365,960 |
| Dr. John L. Hennessy (2) | $ 6,000 | $ — | — | $ 6,000 |
| Dr. Kristina M. Johnson | $ 102,000 | $ 224,960 | — | $ 326,960 |
| Roderick C. McGeary | $ 156,000 | $ 224,960 | — | $ 380,960 |
| Arun Sarin | $ 116,000 | $ 224,960 | — | $ 340,960 |
| Brenton L. Saunders | $ 98,000 | $ 224,960 | — | $ 322,960 |
| Steven M. West | $ 130,000 | $ 224,960 | — | $ 354,960 |

92.     Directors Burns, Bush, Johnson, McGeary, Sarin, and Saunders at all relevant times served on the Cisco Board's Compensation and Management Development Committee.  In addition to receiving lucrative compensation themselves, they also lavished extraordinary executive compensation on Cisco's CEO and other Executive Leadership Team members.  The majority of Cisco's principal executive officers are not racially diverse.  Cisco's 2019 executive compensation is set forth below:

### *Summary Compensation Table*

| Name and Principal Position (1) | Fiscal Year (1) | Salary ($) | Bonus ($) | Stock Awards ($) (2) | Non-Equity Incentive Plan Compensation ($) (3) | All Other Compensation ($) (4) | Total ($) |
|------|------|------|------|------|------|------|------|
| Charles H. Robbins | 2019 | $ 1,325,000 | — | $ 18,576,568 | $ 5,795,550 | $ 132,715 | $ 25,829,833 |
| Chairman and Chief | 2018 | $ 1,231,250 | — | $ 14,940,771 | $ 4,990,711 | $ 121,732 | $ 21,284,464 |
| Executive Officer | 2017 | $ 1,187,308 | — | $ 12,873,491 | $ 2,532,352 | $ 160,613 | $ 16,753,764 |
| Kelly A. Kramer | 2019 | $ 850,000 | — | $ 10,610,100 | $ 2,106,810 | $ 67,500 | $ 13,634,410 |
| Executive Vice President and | 2018 | $ 763,750 | — | $ 8,751,410 | $ 1,857,206 | $ 91,005 | $ 11,463,371 |
| Chief Financial Officer | 2017 | $ 735,000 | — | $ 7,084,573 | $ 940,653 | $ 43,995 | $ 8,804,221 |
| David Goeckeler | 2019 | $ 825,000 | — | $ 9,374,159 | $ 2,044,845 | $ 84,969 | $ 12,328,973 |
| Executive Vice President and General Manager, Networking and Security Business | 2018 | $ 748,077 | — | $ 8,458,949 | $ 1,823,312 | $ 53,816 | $ 11,084,154 |
| Maria Martinez | 2019 | $ 675,000 | $ 6,500,000(5) | $ 6,161,149 | $ 1,574,640 | $ 70,631 | $ 14,981,420 |
| Executive Vice President and Chief Customer Experience Officer | 2018 | $ 194,712 | $ 6,500,000(5) | $ 12,003,070 | $ 400,569 | $ 246,554 | $ 19,344,905 |
| Gerri Elliott | 2019 | $ 750,000 | $ 4,000,000(6) | $ 6,161,149 | $ 1,968,300 | $ 58,002 | $ 12,937,451 |

| Executive Vice President and Chief Sales and Marketing Officer | 2018 | $ 187,500 | $ 6,000,000(6) | $ 10,001,614 | $ 385,941 | $ 273,369 | $ 16,848,424 |
|---|---|---|---|---|---|---|---|

2019 Proxy Statement at 43.

**Minority-Majority Demographic Shifts, Coupled with
Advances in Artificial Intelligence, Urgently Call
for Greater Board-Level Diversity**

93.     America is in the midst of a well-documented minority-majority demographic shift. At the same time, the more widespread availability of new technologies, like algorithms, linked with Artificial Intelligence ("AI") and Big Data, is creating the potential for their use as 21st century tools of racism.  These shifts in American culture and commerce, and their attendant challenges – and potential perils – underscore the urgency for racial and ethnic diversity on corporate boards of directors.

94.     As *Axios* reported on April 29, 2019, "[b]y 2045, the U.S. as a whole is projected to become majority minority.  And the changes are already underway:  non-white Americans are now the majority of the population in four states, as well as in the most prosperous and powerful U.S. cities."   Stef W. Kight, *America's minority majority future*, Axios (Apr. 29, 2019), https://www.axios.com/when-american-minorities-become-the-majority-d8b3ee00-e4f3-4993-8481-93a290fdb057.html.

95.     For companies unable to adapt, this shift is a potentially existential threat, as *Fast Company* reported on January 27, 2020:

> Many companies and executives have repeatedly pledged their commitment to diversity and inclusion efforts, often with little to show for it.  Soon they'll have no choice but to act.
>
> *         *         *
>
> "If there's an unwillingness to revamp the culture to meet the needs and desires of this changing workforce, then those companies are going to be left behind . . . .  Talent is going to shift over to a lot of these smaller, more disruptive, more nimble companies."

Pavithra Mohan, *How the end of the white majority could change office dynamics in 2040*, Fast Company (Jan. 27, 2020), https://www.fastcompany.com/90450018/how-the-end-of-the-white-majority-could-change-office-dynamics-in-2040.

96.     The need for more robust diversity is no more critically urgent than in the technology sector.  With the growing acknowledgment that new facially neutral technologies, like AI and Big Data, may be automating and reinforcing racism and oppression, achieving greater racial diversity at the top and throughout Silicon Valley daily grows more urgent.  Indeed, a recent July 15, 2020 report to the United Nations Human Rights Council on emerging digital technologies and discrimination found that "[e]merging digital technologies driven by big data and artificial intelligence are entrenching racial inequality, discrimination and intolerance."  *Emerging digital technologies entrench racial inequality, UN expert warns*, United Nations Human Rights, Office of the High Commissioner (July 15, 2020), https://www.ohchr.org/EN/NewsEvents/ Pages/DisplayNews.aspx?NewsID=26101 &LangID=E.  Specifically, the report authored by E. Tendayi Achiume, a United Nations Special Rapporteur on racism and independent United Nations human rights expert, concluded that "[t]echnology produced in such fields that disproportionately exclude women, racial, ethnic and other minorities is likely to reproduce these inequalities when it is deployed," and that "[p]roducing technology that works within complex social realities and existing systems requires understanding social, legal and ethical contexts, which can only be done by incorporating diverse and representative perspectives as well as disciplinary expertise."

> Emerging digital technology sectors, such as those in Silicon Valley, are characterized by a "diversity crisis" along gender and race lines, especially at the highest levels of decision-making. . . . "[C]urrently, large scale AI systems are developed almost exclusively in a handful of technology companies and a small set of elite university laboratories, spaces that in the West tend to be extremely white, affluent, technically oriented, and male.  These are also spaces that have a history of problems of discrimination, exclusion, and sexual harassment." . . . "[T]his is much more than an issue of one or two bad actors: it points to a systematic relationship between patterns of exclusion within the field of AI and the industry driving its production on the one hand, and the biases that manifest in the logics and application of AI technologies on the other."

E. Tendayi Achiume, *Racial discrimination and emerging digital technologies: a human rights analysis*, Human Rights Council, ¶17 (June 18, 2020), https://www.ohchr.org/EN/HRBodies/ HRC/RegularSessions/Session44/Documents/A_HRC_44_57_AdvanceEditedVersion.docx (footnotes omitted).

97.     Left unchecked, these risks can result in company exposure to large damages, fines and penalties.  In March 2019, the U.S. Housing and Urban Development ("HUD") agency sued

1 Facebook for housing discrimination because its ad-targeting technology allegedly allowed property

2 owners to target their properties to Facebook users based on race and other factors.  Kaya Yurieff,

3 *HUD charges Facebook with housing discrimination in ads*, CNN Business (Mar. 28, 2019),

4 https://www.cnn.com/2019/03/28/tech/facebook-hud-ad-discrimination/index.html.  Announcing the

5 filing, HUD Secretary Ben Carson stated:  "'Facebook is discriminating against people based upon

6 who they are and where they live . . . . Using a computer to limit a person's housing choices can be

7 just as discriminatory as slamming a door in someone's face.'"  *Id.*

8         98.     The demographic shifts and technological advancements currently underway are

9 impacting, and will continue to impact, America's publicly traded corporations.  If these vital

10 engines of American economic growth cannot adjust, these shifts may become existential threats to

11 their ability to continue as going concerns.

12         99.     Racially and ethnically diverse directors and executives reflect these changes, and

13 their diverse backgrounds, experiences, perspectives, and skills can help corporate boards of

14 directors successfully navigate the minority-majority changeover and threats posed by AI and similar

15 technologies becoming 21st century tools of racism and oppression.  Despite the multi-fold benefits

16 to the Company and its shareholders, Defendants have opted to effectively exclude African

17 Americans from Cisco's Board.  By doing so, they are breaching their fiduciary duty to act in the

18 best interests of Cisco and its shareholders.

19                                   **DERIVATIVE ALLEGATIONS**

20         100.    Plaintiff incorporates ¶¶1-99.

21         101.    Cisco's Board has 10 members – Defendants Burns, Bush, Capellas, Garrett, Johnson,

22 McGeary, Robbins, Sarin, Saunders, and Su (together, "Cisco Board").  On August 5, 2020, Plaintiff

23 made a pre-suit demand on Cisco's Board to, among other things, achieve the Company's publicly

24 stated diversity objective of having a diverse board of directors by adding African American

25 directors to Cisco's Board.  A true and correct copy of Plaintiff's 35-page pre-suit demand

26 accompanies this complaint as Exhibit A.  To date, Defendants have declined to respond to

27 Plaintiff's demand for action.  Even after Plaintiff established its standing as a long-term Cisco

28

1    shareholder six weeks ago, Cisco's Board still has not publicly or otherwise committed to

2    undertaking the relief sought in the pre-suit demand.

3        102.    Accordingly, Plaintiff brings this action against Defendants to remedy the dereliction

4    of their duty to act in the best interests of Cisco and its shareholders.

5        103.    The absence of a single African American on the Cisco Board in September 2020,

6    despite Defendants' stated objective to achieve a diverse Board, exposes the falsity of Defendants'

7    public assertions that Cisco prizes "diverse perspectives" and, therefore, "the Board believes it is

8    important to consider diversity of race, ethnicity, gender, age, education, cultural background, and

9    professional experiences in evaluating board candidates in order to provide practical insights and

10   diverse perspectives."  2019 Proxy Statement at 5.

11       104.    Defendants' refusal to nominate any African American men or women to Cisco's

12   Board, despite up to 50 opportunities to achieve this key diversity objective, is antithetical to Cisco's

13   public representations and their fiduciary duty act in the best interests of the Company and its

14   shareholders.  That chance spoiled so many opportunities for an African American director on

15   Cisco's Board strains credulity.  Especially since, during this same time period, the Company's

16   corporate governance principles, shareholder and corporate citizenship reports, and website postings

17   reveal that Defendants made, or caused Cisco to make, public statements affirming Cisco's

18   commitment to diversity at the top and holding Cisco out as a company that actively promotes and

19   achieves measurable diversity objectives.

20       105.    Further, the absence of an African American director on the Board is not because of a

21   shortage of qualified African American director candidates.  African American men and women are

22   proven leaders in every segment of society, including the academy, the armed forces, business,

23   industry, law, healthcare, science, and technology.  Instead, the absence of an African American

24   director on Cisco's Board is because Defendants' effort (or will) to appoint one is not consistent with

25   the Company's public statements and because of a failure to speak candidly about actually achieving

26   racial diversity on Cisco's Board.  The combination of these two factors amounts to a breach of

27   Defendants' fiduciary duty to act in the best interests of Cisco and its shareholders.

28

106.    A director must speak the entire truth whenever he or she undertakes to say anything on behalf of the corporation.  A director likewise must act consistent with the corporation's stated initiatives, policies and programs designed to promote diversity and inclusion at the corporation.  Here, the overall misleading nature or falsity of Defendants' statements that Cisco's Board believes a diverse boardroom is important is exposed by the fact that Cisco has no African Americans on its Board, and has not had any since at least 2015.

107.    Cisco's headquarters are located in one of the most economically vibrant and demographically diverse locations in the world – the San Francisco Bay Area.  Near Cisco are two of the world's most prestigious academic and research institutions – UC Berkeley and Stanford University.  African American alumni and faculty of Bay Area universities, including UC Berkeley and Stanford, have become leaders in business, law, technology, medicine, education, and government.  They are top executives of Fortune 500 companies, partners of major law firms, and former Presidential cabinet-level secretaries and advisors.  Cisco's close proximity to an extraordinarily talented pool of potential director candidates, combined with Defendants' failure to nominate African American men and/or women to the Cisco Board, puts the lie to their stated intention to promote diversity at the top of Cisco.

108.    The case for racial/ethnic diversity in the boardroom is now overwhelming.  In 2018, McKinsey found "that companies with the most ethnically/culturally diverse Boards worldwide are 43% more likely to experience higher profits."  *Delivering through Diversity* at 13.  Recognizing diversity enhances shareholder wealth.  Other Bay Area companies in general, and Silicon Valley companies in particular, have African American directors.  These companies presently enjoy the benefits of the demographic and cognitive diversity that African American directors bring to boards of directors. But not Cisco. Defendants have acted in dereliction of their fiduciary duty to maximize Cisco's corporate value, which has injured the Company and its shareholders.  Defendants are substantially liable to Cisco for the resulting damages.

109.    Defendants' dereliction of their fiduciary duties to speak honestly about Cisco's commitment to diversity and maximize corporate value is not in the best interests of the Company

and its shareholders.  Nonetheless, Cisco's Board has wrongfully refused to respond to Plaintiff's pre-suit demand.  Accordingly, Plaintiff is entitled to pursue this action on behalf of Cisco.

## COUNT I

### Against All Defendants for Violation of §14(a)
### of the Exchange Act and SEC Rule 14a-9

110.    Plaintiff incorporates ¶¶1-109, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegations of, or reference to any allegations of fraud, scienter, or recklessness with regard to this claim

111.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9(a).

112.    The Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing Cisco to publicly claim support for diversity and inclusion at all levels of the Company, including for director candidates from historically underrepresented races and ethnicities to serve on Cisco's Board.  Defendants have confirmed through their actions (and lack thereof) that they are not committed to true diversity throughout Cisco's ranks, including in the boardroom, facts that Defendants were aware of and participated in as set forth herein.

113.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading when issued.

114.    The misrepresentations and omissions in the Proxy Statements were material to Plaintiff and would be material to reasonable investors who voted on each Proxy Statement.  The Proxy Statements were an essential link in Cisco shareholders following the Company's recommendation to re-elect Defendants to the Cisco Board and approve the executive pay packages,

1   as revelations of the truth would have immediately thwarted a continuation of the shareholders'

2   endorsement of the directors' positions and the executive officers' compensation.

3       115.    The Company was damaged as a result of the material misrepresentations and

4   omissions in the Proxy Statements.

5                               **COUNT II**

6                   **Against All Defendants for Breach of Fiduciary Duty**

7       116.    Plaintiff incorporates ¶¶1-109.

8       117.    Defendants owed and owe Cisco fiduciary obligations.  By reason of their fiduciary

9   relationships, Defendants owed and owe Cisco the highest obligation of loyalty, good faith, due care,

10  oversight, and candor.

11      118.    Defendants violated and breached their fiduciary duties of loyalty, good faith, due

12  care, oversight, and candor.

13      119.    Specifically, each of the Defendants, in breach of their fiduciary duties of care,

14  loyalty and good faith, intentionally or recklessly caused the Company to disseminate to Cisco

15  shareholders materially misleading and inaccurate information through, among other things, the SEC

16  filings and other public statements and disclosures as detailed herein.  Defendants had actual

17  knowledge of their misrepresentations and omissions of material fact or acted with reckless disregard

18  for the truth in failing to ascertain and disclose such facts even though such facts were available to

19  them.

20      120.    As a direct and proximate result of Defendants' conscious failure to perform their

21  fiduciary obligations, Cisco has sustained significant damages.  As a result of the misconduct alleged

22  herein, Defendants are liable to the Company.  Defendants breached their fiduciary duties owed to

23  Cisco and its shareholders by willfully, consciously, and/or intentionally failing to perform their

24  fiduciary duties to act in the best interests of Cisco and its shareholders to maximize corporate value.

25                              **COUNT III**

26                   **Against All Defendants for Unjust Enrichment**

27      121.    Plaintiff incorporates ¶¶1-109.

28

122.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Cisco.  Defendants were unjustly enriched by their receipt of compensation while breaching fiduciary duties owed to Cisco.

123.    Plaintiff, as a representative of the Company, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all damages, injuries, and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, and insider sales proceeds, and imposing a constructive trust thereon;

C.    Directing Cisco to take all necessary actions to remove the institutional structures preventing the Company from achieving its stated diversity objectives, including, but not limited to, adopting, implementing and maintaining the following initiatives, policies and procedures designed to promote greater racial diversity, equity and inclusion:

(i)    Nominate three new persons to serve on the Cisco Board, which candidates shall include two African Americans and one other racial minority to replace three current Cisco directors;

(ii)    Invest $400 million in economic and social justice programs for the African American community designed to address historical racial disparities;

(iii)    Fill 15% of all new positions in the United States with African Americans;

1         (iv)    Finance 100 education scholarships valued at $100,000 each for K-12 African

2 American students annually at partner schools located in the communities in which the Company

3 does business;

4         (v)    Invest in the Company's talent pipeline by creating and/or expanding

5 connections with Historically Black Colleges and Universities located in the United States;

6         (vi)    Give diversity, equity and inclusion sustained C-suite support by shifting from

7 preventative measures, such as anti-bias training, to proactive ones, such as increasing the number of

8 African American candidates considered for open positions and rewarding the people who contribute

9 to the Company's success;

10         (vii)    Develop a program to ensure fair and equitable hiring across the Company –

11 to remove hiring bias, increase representation of African Americans within senior corporate

12 leadership, management and supervisory ranks, and create more board-level accountability and

13 oversight for the advancement of diversity and inclusion practices and systems within the Company;

14         (viii)    Provide managers the skills they need to support diversity, equity and

15 inclusion efforts; and

16         (ix)    Create a public facing dashboard reporting the Company's progress, which

17 shall identify, among other things:

18         (1)    the representation of African American women in the United States at

19 the vice president and above level;

20         (2)    the representation of African Americans in the United States at the

21 vice president and above level;

22         (3)    the representation of African American men and women on the Cisco

23 Board;

24         (4)    the percentage of Cisco's workforce actively engaged in promoting the

25 Company's diversity, equity and inclusion efforts; and

26         (5)    the names of the African American-owned businesses located in the

27 United States the Company has partnered with during the fiscal year;

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1          D.      Awarding punitive damages;

2          E.      Awarding costs and disbursements of this action, including reasonable attorneys' and

3  experts' fees; and

4          F.      Granting such other and further relief as this Court may deem just and proper.

5                                          **JURY DEMAND**

6          Plaintiff hereby demands a trial by jury.

7  DATED:  September 23, 2020                    ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
8                                               SHAWN A. WILLIAMS

9

10                                                 *s/ Shawn A. Williams*
                                                  SHAWN A. WILLIAMS
11
                                               Post Montgomery Center
12                                             One Montgomery Street, Suite 1800
                                               San Francisco, CA  94104
13                                             Telephone:  415/288-4545
                                               415/288-4534 (fax)
14
                                               ROBBINS GELLER RUDMAN
15                                               & DOWD LLP
                                               DARREN J. ROBBINS
16                                             TRAVIS E. DOWNS III
                                               BENNY C. GOODMAN III
17                                             655 West Broadway, Suite 1900
                                               San Diego, CA  92101
18                                             Telephone:  619/231-1058
                                               619/231-7423 (fax)
19
                                               Attorneys for Plaintiff
20
                                               ASHERKELLY
21                                             CYNTHIA J. BILLINGS-DUNN
                                               25800 Northwestern Highway, Suite 1100
22                                             Southfield, MI  48075
                                               Telephone:  248/746-2710
23                                             248/747-2809 (fax)

24                                             Additional Counsel for Plaintiff

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 45

## VERIFICATION

I, Shawn A. Williams, hereby declare the following:

1.     I am one of the attorneys for Plaintiff. This verification is based upon my personal knowledge and I could competently testify to the statements contained herein if called upon as a witness.

2.     I have knowledge of the facts alleged in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment and Violation of the Federal Securities Laws, and I believe them to be true to the best of my information and belief.

3.     I make this verification because Plaintiff is absent from the County of San Francisco where I maintain my office.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of September, 2020, at San Francisco, California.

_____
SHAWN A. WILLIAMS